IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**DENOVO BRANDS, LLC**                                                                                          **PLAINTIFF**

V.                                      **CASE NO. 5:24-CV-5043**

**REACH VENTURES, LLC, an Idaho**
**Limited Liability Company**                                                                                  **DEFENDANT**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court are Defendant Reach Ventures, LLC's Motion to Dismiss and Brief in Support (Docs. 14 & 15), Plaintiff Denovo Brands, LLC's Response in Opposition (Doc. 23), and Reach's Reply (Doc. 27). On May 2, 2024, the Court held a hearing on the pending Motion and directed the parties to engage in a twenty-one-day period of expedited discovery regarding the validity of an Idaho forum-selection clause that appears in their most recent contract. Once the discovery period ended, the parties filed supplemental briefs and supporting evidence (Docs. 32 & 33), which the Court has now considered. For the reasons stated below, the Motion to Dismiss is **GRANTED**.

**I.   BACKGROUND**

Denovo is an Arkansas limited liability company that manufactures camping products, foldable outdoor chairs, hammocks, and hammock stands. It has an overseas subsidiary named Denovo (HK) Limited ("DHK") that manufactures some of Denovo's products in China. Reach is an online retailer that purchases other companies' products and then resells them on Amazon.com and other e-commerce platforms.

On August 31, 2022, Denovo and Reach signed a contract agreeing that Reach would serve as the exclusive online reseller of certain domestically produced Denovo

1

products. *See* Doc. 13-1 ("August Agreement"). The August Agreement was a modified version of a contract originally drafted by Reach. The parties altered certain terms to comport with their agreement, including changing the mandatory forum-selection clause from Idaho, where Reach is headquartered, to Arkansas, where Denovo is headquartered. *See id.* at ¶ 9.

On September 14, 2022, Denovo's subsidiary, DHK, entered into a similar exclusive online resale agreement with Reach. *See* Doc. 13-2 ("September Agreement"). The September Agreement covered the online resale of Denovo's products manufactured in China; but otherwise, the September and August Agreements were identical in form and nearly identical in content. The September Agreement contained the same Arkansas forum-selection clause as the August Agreement. *See id.* at ¶ 9.

Over the next few weeks, Denovo and Reach negotiated new payment terms for the August Agreement covering the resale of domestically manufactured goods. Jay Schrade, Denovo's Vice President of Accounting/Financing/Business Operations, took the lead in preparing the amended contract. He started by pulling up an early draft of the August Agreement to use as a template. He modified Section 1(b) to alter the number of days' notice that would be required to terminate the contract and changed a payment term in Section 3. He did not realize that the template he used contained an Idaho forum selection clause. *See* Schrade Declaration, Doc. 13-3.

Mr. Schrade emailed the contract he drafted to Reach's CEO, Adam Anderson, on

2

October 20, 2022.[1] Mr. Schrade's cover email was as follows:

> Adam,
>
> Attached is the word document with the correct terms we discussed on the phone. **The only change made on this document from the Docusign is in section 3**, the payment terms are 70 days from the date product is shipped by the manufacturer, instead of 70 days from receipt by the reseller.
>
> Can you please send via Docusign to Steve [Perry, President of Denovo]? Steve will sign and send it right back to get it fully executed.
>
> Thanks,
>
> Jay

*Id.* at p. 22 (emphasis added). With the benefit of hindsight, it is clear that Mr. Schrade's cover email was inaccurate. He failed to tell Mr. Anderson that he had amended terms in Section 3 *and* in Section 1(b). He also failed to mention that the forum-selection clause had reverted to Idaho—as that change was entirely unintentional.

Once Mr. Anderson received Mr. Schrade's email and draft contract, he "read the whole document." (Doc. 33-1, p. 46). That is, he did not simply look at Section 3 or for particular changes, but instead read the contract from start to finish "to see if [he] agreed with the document and the way it was laid out." *Id.* at p. 47.

When Denovo's counsel asked Mr. Anderson whether he took specific notice at the time that the forum-selection clause had switched from Arkansas to Idaho, he stated:

---

[1] Mr. Anderson testified less than a month ago that he was either the CEO or the COO of the company when these events unfolded in August, September, and October 2022. *See* Doc. 33-1, pp. 7–8. It does not particularly matter which office he held. The important point is that he was authorized by Reach to negotiate contract terms with Denovo.

> No. Wasn't even in my mind. 90 percent of our agreements have Idaho. We rarely change it to another state. I don't recall ever having any discussion about it, so it wasn't even in my mind something I would catch or look out for. I read it wholly, I agreed to everything in it, and I was okay with the way it was written. And I thought they were, too. They sent it over, and I assumed if there was anything that they didn't agree to, that they would bring it up. But I didn't see anything that would have caused concern for myself or that I needed to bring up to Denovo.

*Id.*

Mr. Anderson was also asked whether he would have notified Mr. Schrade if it had seemed obvious that a mistake had been made in drafting the amended agreement. To that, Mr. Anderson responded:

> In good faith, if I thought and I believed that the other party had made a big mistake, I would bring it up. ***That never came to me, that never crossed my mind, I didn't think there was a mistake.*** I didn't—I wasn't looking for mistakes. I was reading the contract to see if Reach was okay with the contract. I expect business owners and executives of businesses to be able to read their contracts and sign them once they're okay with what's in them. That's how we handle all agreements. But, no, I did not notice the change to jurisdiction, and it's not even something I would have picked up because 90 percent of the time, it's Idaho, and that's the norm.

*Id.* at p. 49 (emphasis added).

After reviewing Mr. Schrade's proposed draft, Mr. Anderson uploaded it to an application called "Docusign" to await the electronic signature of Reach's Chief Partnerships Officer, Adam Eshenroder. Mr. Eshenroder testified in his deposition that he was not personally involved in the negotiations between Mr. Schrade and Mr. Anderson but was generally made aware of them through his later conversations with Mr. Anderson. *See* Doc. 33-2, pp. 15, 22. Mr. Eshenroder stated that he read the proposed contract—though he only had it open online for twenty-six seconds—before he affixed his electronic signature. *Id.* at pp. 28–29. He did not think the contract "seem[ed] out of the ordinary."

*Id.* at p. 22. Mr. Eshenroder agreed that he did not notice that the forum-selection clause had changed from Arkansas to Idaho when he signed the draft. *Id.* at p. 30.

Next, Mr. Perry of Denovo affixed his electronic signature to the draft contract, making it a fully binding agreement. *See* Doc. 13-4 ("October Agreement"). Mr. Perry explained in a declaration submitted to the Court that he did not read the document before signing. Instead, he "signed at the request of Jay Schrade and relied upon him as it relates to the negotiation of the document." (Doc. 33-3, pp. 3–4). The parties understood that the October Agreement entirely superseded the August Agreement and governed how the parties would treat the online sale of Denovo's domestically produced goods.

For the next several months, the parties performed on the September and October Agreements. Sometime in mid-2023, Denovo claims Reach started getting behind on its payments. Denovo demanded payment for months of overdue balances, but Reach refused. On August 4, 2023, Reach informed Denovo that it would be unable to make its upcoming payment and cancelled all open purchase orders on undelivered products. Two weeks later, on August 18, Denovo's legal counsel sent a termination letter to Reach, accusing it of materially breaching the parties' contracts. Denovo contends it is owed in excess of $2 million in compensatory damages for breach of contract plus the return of a certain quantity of unsold product that Reach is storing in its warehouse.

Reach denies that it breached the parties' contracts and claims Denovo is the party that breached. From Reach's point of view, Denovo violated the exclusive-seller provision of both operative contracts by selling products directly to consumers at prices that were lower than Reach's and by permitting other business to resell Denovo's products online.

5

The parties tried and failed to mediate their disputes, as was required by their contracts. Following that, Reach filed a breach-of-contract action against Denovo and DHK in Idaho state court. The complaint was filed of record on October 27, 2023, but Reach held off on serving it. Several weeks later, on November 20, 2023, Denovo filed—and served—a complaint against Reach in California state court, seeking a writ of possession to Denovo products allegedly being stored in Reach's California warehouse. After a round of early motion practice, Denovo nonsuited the California case and filed suit on January 17, 2024, against Reach in Arkansas state court for breach of contract and conversion. Denovo served its Arkansas complaint on Reach on January 19, 2024, and Reach responded by serving its earlier-filed Idaho complaint a few days later on January 24. Both parties removed their respective state-court lawsuits to federal court.

Clearly, the Idaho suit is duplicative of the instant one. It would be a waste of time, money, and judicial resources to allow them to proceed in parallel.[2] Because the parties are well aware of this, Reach filed the instant Motion to Dismiss in this Court, while Denovo filed a mirror-image motion to dismiss in the District Court of Idaho. Both sets of motions are now ripe, and the same arguments are asserted in both jurisdictions.

Reach's Motion to Dismiss filed here argues that the lawsuit should proceed in Idaho because the Idaho complaint was filed first and the October Agreement contains an Idaho forum-selection clause. Denovo's motion filed in Idaho argues the case should

---

[2] The two suits are parallel even though DHK is a party to the suit in Idaho but not to the suit here. Both suits allege breaches of the same contracts, and DHK does not intend to continue as a party to the Idaho suit because it has assigned all of its rights under the September Agreement to Denovo. *See* Doc. 32-3.

proceed in Arkansas because the September Agreement specifies an Arkansas forum-selection clause, the October Agreement's forum-selection clause is void due to mutual mistake, and—absent a valid Idaho forum-selection clause—Idaho lacks personal jurisdiction over Denovo due to a lack of minimum contacts.

## II. LEGAL STANDARD

"Generally, the doctrine of federal comity permits a court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district." *Orthmann v. Apple River Campground, Inc.*, 765 F.2d 119, 121 (8th Cir. 1985). This so-called first-to-file rule is meant to prevent duplicative litigation and conflicting judgments, as well as to conserve judicial resources. *Id.* It is a discretionary rule that "gives priority, for purposes of choosing among possible venues when parallel litigation has been instituted in separate courts, to the party who first establishes jurisdiction." *Nw. Airlines, Inc. v. Am. Airlines, Inc.*, 989 F.2d 1002, 1006 (8th Cir. 1993). "The rule, however, yields to the interests of justice, and will not be applied where a court finds 'compelling circumstances' supporting its abrogation." *Id.* (quoting *United States Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487, 488 (8th Cir. 1990)).

Compelling circumstances may be present when the first party to file suit: (1) did so in anticipation of the opposing party's lawsuit; (2) did so in bad faith; (3) filed an action for declaratory judgment; or (4) inappropriately raced to the courthouse after the other party gave notice of its intention to sue. *See Boatmen's First Nat'l Bank of Kansas City v. Kan. Pub. Emps. Ret. Sys.*, 57 F.3d 638, 641 (8th Cir. 1995).

### III. DISCUSSION

### A. First-to-File Rule

Denovo argues that the first-to-file rule should really be interpreted as the "first-to-serve rule." In other words, Denovo contends that because it served its lawsuit first, Arkansas should be considered the first-filed jurisdiction. The problem with Denovo's argument is that it has been rejected previously by this Court.

In *Tadlock v. HEK, LLC*, 2023 WL 4224829 (W.D. Ark. June 2, 2023), the Court considered a case involving a plaintiff who filed suit in Arkansas exactly one day before the defendant filed suit in Minnesota. The defendant argued that its suit should be considered first-filed because it was first-served. The Court disagreed and denied the defendant's motion to transfer the case to Minnesota, citing with approval the District of Minnesota's opinion in *Twin Cities Gaming Supplies, Inc. v. Fortunet, Inc.*, 2010 WL 391294 (D. Minn. Jan 25, 2010). In *Twin Cities*, the district court had surveyed Eighth Circuit precedent on the first-to-file rule and concluded that it meant that "the first court in which jurisdiction attaches has discretionary power to enjoin the parties from proceeding with a later filed action in another federal court." *Id.* at *2 (citing *Keymer v. Mgmt. Recruiters, Int'l Inc.*, 169 F.3d 501, 503 n.2 (8th Cir. 1999); *Nw. Airlines*, 989 F.2d at 1005; *Orthmann*, 765 F.2d at 121). Unfortunately, the phrase "in which jurisdiction attaches" has not been defined by the Eighth Circuit; however, the *Twin Cities* court opined—as have other district courts—that a court's jurisdiction attaches when it first has "the power to act" or "power to decide a case or issue a decree," which occurs at the moment that "an action has been filed with the court " *Twin Cities*, 2010 WL 391294, at *3 (relying on *Ill. Blower*,

8

*Inc. v. Deltak, LLC*, 2004 WL 765187, at *1 (N.D. Ill. Apr. 7, 2004) and *Marietta Campbell Ins. Grp., LLC v. Jefferson-Pilot Life Ins. Co.*, 2007 WL 3197311, at *1 (D.N.D. Oct. 26, 2007)).

When this Court faced similar facts and a motion to transfer in the *Tadlock* case, it cited *Twin Cities*'s reasoning and conclusion and observed:

> When parallel litigation is proceeding in two states, it makes sense to conserve resources and avoid conflicting outcomes by litigating in the state where jurisdiction first attached—that is, the state where a court first had the power to act—and dismissing the later-filed lawsuit. In the case at bar, the Minnesota state court had no power to act or issue a decree until March 7, the date KMG filed its amended complaint of record. The Arkansas state court had the power to act on March 6, the date Mr. Tadlock filed suit. Though only a day separates the filing of the two lawsuits, the Court finds that Mr. Tadlock's suit was filed first.

*Tadlock*, 2023 WL 4224829, at *4. Since jurisdiction attaches at the time of filing, it is the act of filing, rather than serving, that determines priority when deciding which of two jurisdictions should preside over a dispute.

In the case at bar, Reach filed suit in Idaho eighty-three days before Denovo filed suit in Arkansas, which means Idaho is the first-filed jurisdiction by a long shot. This is not the end of the analysis, however, as the Court, in its discretion, may refuse to transfer to the first-filed jurisdiction if compelling circumstances exist. To assist district courts in evaluating this factor, the Eighth Circuit adopted a four-pronged test articulated in *Boatmen's First National Bank*. 57 F.3d at 641.

The first *Boatmen's* factor asks whether the party that filed first did so in anticipation of the opposing party's lawsuit. Here, neither party suggests that Reach knew or even suspected Denovo intended to file suit when Reach filed in October 2023. Indeed,

9

Denovo did not file suit in Arkansas until January 2024. The timing alone indicates there was nothing nefarious about Reach's decision to file suit in Idaho. The second *Boatmen's* factor naturally proceeds from the first: It asks whether Reach filed suit in bad faith. Again, there is no evidence of this. The third factor asks whether the first suit is a declaratory judgment action—and it is not. And the fourth factor asks whether Reach inappropriately raced to the courthouse after Denovo gave notice of its intention to sue. Here, neither party suggests that happened.

### B. Validity of the Idaho Forum-Selection Clause

Though the *Boatmen*'s factors indicate that proceeding in Idaho would not contravene the interests of justice, Denovo argues there are other pragmatic and compelling reasons weighing against dismissal or transfer. First, Denovo maintains that the Idaho forum-selection clause is the product of a mutual mistake and is unenforceable. Absent a valid forum-selection clause, Denovo is confident that the Idaho district court will dismiss the case before it for lack of personal jurisdiction—which means the matter will ultimately make its way back to this Court after a months'-long detour in Idaho. Second, Denovo contends that even if the Idaho clause is deemed valid, the September Agreement has an equally valid forum-selection clause favoring Arkansas. Since the majority of Denovo's claim for damages relates to breaches of the September Agreement, Denovo believes the interests of justice favor litigating the dispute in this forum.

Reach responds that the Idaho forum-selection clause is enforceable because it was not the product of a mutual mistake. As a result, Denovo's objection to personal jurisdiction in Idaho will likely be moot. With regard to the Arkansas forum-selection clause

in the September Agreement, Reach notes that the majority of its damages arise from the other contract, so the interests of justice favor litigating all disputes in Idaho, the first-filed forum. The Court examines these arguments below.

### 1. Mutual Mistake

The parties' post-discovery supplementary materials establish as a matter of law that the Idaho forum-selection clause in the October Agreement was not the product of a mutual mistake. "Mutual mistake must be shown by clear and decisive evidence that, at the time the agreement is reduced to writing, both parties intended their written agreement to say one thing and, by mistake, it expressed something different." *Lambert v. Quinn*, 32 Ark. App. 184, 187 (1990). "[E]ach must have labored under the same misconception in respect to the terms of the written instrument." *Id.* "[T]he issue is not what the document actually says, or what one party intended it to say, but whether the document truly expresses the agreement made by both parties at the time." *Id.* at 188.

Any mistake about the Idaho forum-selection clause was certainly not *mutual*, as Reach does not contend it was mistaken. The undisputed facts gathered in discovery confirm that Mr. Schrade of Denovo prepared the October Agreement and that Mr. Anderson of Reach read the document and found its terms acceptable before uploading it to Docusign. Then, Mr. Eshenroder briefly reviewed and signed the document, and Mr. Perry of Denovo countersigned without reading it first. The forum-selection clause appears conspicuously on the same page as the parties' signatures. *See* Doc. 13-4, p. 4. There is no evidence that the forum-selection clause was precured by fraud, and in the absence of fraud, Mr. Perry is "bound, under the law, to know the contents of a paper

11

signed by him, and he cannot excuse himself by saying he did not read it or know what it contained." *Pittsburgh Steel Co. v. Wood*, 160 S.W. 519, 521 (Ark. 1913).

### 2. Unilateral Mistake

Assuming Denovo made a unilateral mistake in agreeing to the Idaho forum-selection clause, Denovo must live with it. "A unilateral mistake cannot be the ground for reformation" of a contractual provision. *Yeargan v. Bank of Montgomery Cnty.*, 268 Ark. 752, 754 (Ark. App.1980). Moreover, it is of no legal consequence that the change from Arkansas to Idaho was not specifically discussed by the parties before they executed the October Agreement. "The fact . . . that the individual clauses [in a contract] were not actually negotiated does not render the [forum selection] clause per se unenforceable." *M.B. Rests., Inc. v. CKE Rests., Inc.*, 183 F.3d 750, 753 (8th Cir. 1999). "Forum selection clauses are prima facie valid and are enforced unless they are unjust or unreasonable or invalid for reasons such as fraud or overreaching." *Id.* at 752 (citing *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 15 (1972)). Since the Idaho forum-selection clause appears to be valid, it is likely Denovo has waived any objection to personal jurisdiction in Idaho. *See Dominium Austin Partners, L.L.C. v. Emerson,* 248 F.3d 720, 726 (8th Cir. 2001) ("Due process is satisfied when a defendant consents to personal jurisdiction by entering into a contract that contains a valid forum selection clause.").

### 3. Competing Forum-Selection Clauses

The final thorny issue to address is whether one contract's forum-selection clause should govern the entire dispute. The parties claim damages under both contracts, and the claims are legally and factually related. The parties agreed during the motion hearing

that it would be difficult, if not totally infeasible, to bifurcate the claims under each contract and litigate them in separate jurisdictions. To avoid duplicative litigation and conflicting rulings, it seems the most prudent course of action is to choose one forum to hear all pending contract-related disputes.

Unfortunately, there is no relevant circuit precedent that is binding—or even helpful—on these matters, so the Court has turned to district court opinions for guidance. The Eastern District of Virginia notes that "[f]ederal courts construing conflicting forum selection clauses governing separate claims raised in a single action often decline to enforce both clauses out of concern for wasting judicial and party resources." *Jones v. Custom Truck & Equip., LLC,* 2011 WL 250997, at *4 (E.D. Va. Jan. 25, 2011). The District of Minnesota agrees, observing that when enforcing multiple forum selection clauses "would force the parties to litigate 'in multiple forums, the exact same claims,' the Court would enforce the forum selection clause in one agreement." *Capsource Fin., Inc. v. Moore*, 2012 WL 2449935, at *4 (D. Minn. June 27, 2012) (quoting *Pressdough of Bismarck, LLC v. A & W Rests., Inc.*, 587 F. Supp. 2d 1079, 1086 (D.N.D. 2008)). A case-by-case, fact-intensive analysis is required. *See, e.g.*, *Bio World Merck, Inc. v. Interactive Bus. Info. Sys., Inc.*, 2020 WL 6047605, at *5 (N.D. Tex. Oct. 9, 2020) (enforcing the forum-selection clause out of which the majority of the plaintiff's claims arose); *Freedom Mortg. Corp. v. Irwin Fin. Corp.*, 2009 WL 763899, at *4–5 (D. Del. Mar. 23, 2009) (enforcing a California forum-selection clause over a Delaware forum-selection clause because California was the first-filed jurisdiction).

Here, neither contract is primary in terms of potential damages. Reach contends

that its claim for $16 million arises from both contracts, with the majority relating to the October Agreement (with the Idaho forum-selection clause). *See* Doc. 32, p. 10. And Denovo claims nearly $3 million in damages on both contracts, with around $2.2 million arising from the September Agreement (with the Arkansas forum-selection clause). *See* Doc. 33, p. 9. The venue transfer statute at 28 U.S.C. § 1404(a) requires the Court to consider the convenience of the parties and witnesses and the interests of justice. But either forum would be equally convenient (or inconvenient, as the case may be) for the parties and witnesses, as the contracts were negotiated and performed by the parties in their respective principal places of business, Idaho and Arkansas. Given all this, the tiebreaker must go to the forum where jurisdiction first attached, which is Idaho. The Court believes the interests of justice are best served by allowing the case to proceed there.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Reach Ventures, LLC's Motion to Dismiss (Doc. 14) is **GRANTED** for the reasons stated herein, and the case is **DISMISSED WITHOUT PREJUDICE** pursuant to the first-to-file rule. The Court declines to transfer this case to Idaho because both cases are in the same early procedural posture; indeed, the only filings in both cases are the original complaints and requests to transfer or dismiss. There does not appear to be any procedural barrier to Denovo asserting its counterclaims and defenses in Idaho.

**IT IS SO ORDERED** on this 13th day of June, 2024.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

14